UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| MARISSA TORRES, Individually and | § | |
| On Behalf of All Similarly Situated Persons, | § | |
|     Plaintiff | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 5:20-cv-0212-H |
| | § | |
| CHAMBERS PROTECTIVE SERVICES, | § | |
| INC., JOHN CHAMBERS, CHRISTINA | § | |
| CHAMBERS, JAMES CHAMBERS, | § | |
| AMBER CHAMBERS ARRIAGA, and | § | |
| ALLEN CHAMBERS, | § | |
|     Defendants | § | |

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR
RESPONSE TO PLAINTIFF'S MOTION TO AUTHORIZE
NOTICE TO SIMILARLY SITUATED INDIVIDUALS**

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Defendants Chamber Protective Services, Inc., John Chambers, Christina Chambers, James Chambers, Amber Chambers Arriaga, and Allen Chambers, Defendants, (hereinafter referred to as "Chambers") and file this brief in support of the response to Plaintiff's motion to authorize notice to similarly situated individuals and, in support thereof, would respectfully show the Court as follows:

1.

DISCUSSION

A.    <u>Introduction</u>

At issue in this case is whether the Court should, in light of the Fifth Circuit's recent decision in *Swales v. KLLM Transp. Servs., L.L.C.,* 985 F. 3d 830 (5th Cir. 2021), grant Plaintiffs'

1

request to authorize notice to similarly situated individuals. In *Swales*, the Fifth Circuit held that the district court should at the beginning of a Fair Labor Standards Act (FLSA) proposed collective action case determine the factual and legal considerations to be used to determine whether a group of individuals are similarly situated so as to receive notice as opt-ins for a proposed putative class. *Swales* at 441. After considering the evidence on this issue, the district court will then determine whether the plaintiffs have satisfied their burden of establishing that the plaintiffs and the proposed opt-ins are similarly situated. *Id.* at 442. If the plaintiffs fail to satisfy their burden, the district court may decide: (1) that the case cannot proceed on a collective basis; (2) that further discovery is needed; or (3) that certain subcategories of plaintiffs and opt ins should receive notice. *Id.*

This Court has, in accordance with *Swales*, stated that the material legal issues for determining the similarly situated issue are: (1) whether the putative class members are similarly situated with respect to the economic realities test; and (2) whether the plaintiff has met her burden of showing the similarities of the putative class members. Additionally, this Court has identified the following material factual considerations to be considered in determining the material legal issues: (1) the job descriptions and tasks of the putative class members – including the advertised and actual responsibilities of the potential class members; (2) the terms of employment of the putative class members – including whether they had employment contracts or other written or unwritten employment terms, and the method, rate and frequency of pay; (3) the hours that the putative class members worked – including the types of shifts and the amount of hours per week that they worked; and (4) any other facts supporting the similarity of the putative class members for the purpose of applying the economic realities test.

The economic realities test is used in the employment context to determine whether an

individual is either an employee or an independent contractor. The Fifth Circuit has stated that the factors to be considered in applying the economic realities test are: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the workers and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008).

B.  Chambers' Operations

Chambers is a business entity that, among other things, furnishes gate attendant and security type services for customers, particularly, in rural areas where the customer is operating on a large tract of land such as a wind farm or oil lease. (App. 1-2). Chambers bids on projects throughout the nation. (App. 1). The present case involves gate attendant services where an individual gate attendant is required to monitor who enters and exits a job site. (App. 2). Gate attendants are not security guards and do not perform security guard services as security guards are required to be licensed. (App. 2). No license is required for a gate attendant. (App. 2).

With regard to the projects relevant to this case, a prospective customer will list a need for gate attendants at a particular site. (App. 2). The customer indicates the length of time that the service will be needed as well as the number of hours required for each day and any miscellaneous items. (App. 2). Chambers then bids on the project by giving an hourly rate for the gate attendant services. (App. 2). If Chambers is awarded the project, it in turn offers the job to project managers. (App. 2). Project managers are independent contractors used by Chambers to take over and furnish the gate attendant services on a project. (App.). The terms "project manager" and "supervisor" are

3

interchangeable in this case. (App. 2). Plaintiff Marissa Torres was a project manager/supervisor. (App. 2). For the purposes of this brief and to help clarify the issues in this case, since Plaintiff and the Court have referred to Plaintiff as a supervisor, Chambers will use the term "supervisor" in place of "project manager." There were eight supervisors servicing projects during the relevant time period in this case. (App. 2).

A supervisor is under no obligation to take a particular project. (App. 2). If a supervisor does want to work at a particular project, the supervisor and Chambers negotiate an agreement for the hourly rate to be paid to the supervisor for the gate attendant hours needed for the project. (App. 2). Supervisors are free to take or not take projects, to work or not work. (App. 2). There is no requirement that a supervisor bid on projects. (App. 2). Some supervisors work sporadically while others run multiple projects and crews simultaneously. (App. 2-3). In addition to the agreed upon hourly amount, Chambers provides a supervisor a housing per diem for a project, which the supervisor can use however he or she wants. (App. 3). Additionally, most clients require Chambers to furnish a vehicle at a job site. (App. 3). Chambers provides the vehicle for use at the site only. (App. 3). The vehicle is not to be used off site for personal use. (App. 3).

After awarding a project to a supervisor, Chambers gives them the name of the client's contact person for the project. (App. 3). The supervisor then contacts the project contact person and makes the necessary arrangements for performing the gate attendant duties. (App. 3). This includes determining how many gate attendants the supervisor wants to have working on the project, as well as the amount the supervisor will pay individual gate attendants. (App. 3). Chambers has very little involvement in the relationship between supervisors and their gate attendants. (App. 3). The supervisors determine the number of gate attendants they need for a

project, and then hire and pay those individuals. (App. 3). There were approximately fifty gate attendants working on projects during the relevant time period. (App. 2). The supervisors decide when gate attendants will work, the number of hours to be worked by each gate attendant on a project, and the amount to be paid to a gate attendant. (App. 3). None of these things are decided by Chambers. (App. 3).

From Chambers' perspective, once a project is awarded to a supervisor, it is for them to run. (App. 3). If a customer has an issue, they deal with the supervisor. (App. 3). Chambers only gets involved if necessary. (App. 3). For example, if a supervisor needs a gate attendant for a project and is unable to find someone, Chambers will furnish the supervisor with the names of individuals who have responded to a standard job notice issued by Chambers. (App. 3). Additionally, if asked by a supervisor, Chambers will on occasion furnish t-shirts that the supervisor can give to gate attendants who don't have appropriate clothing to wear on a job site. (App. 3). Chambers also maintains a list of the gate attendants who work on a project and will, on occasion, pay a gate attendant if the gate attendant was not paid by the supervisor. (App. 3-4).

C.   The Putative Class Members are Not Similarly Situated with Plaintiffs

When evaluating the similarly situated issue in this case, it is apparent that the gate attendants are not similarly situated to Plaintiff. Plaintiff was a supervisor. (App.). The individuals to which Plaintiff seek to send notice and join as a putative class are primarily gate attendants. There are approximately fifty gate attendants who have served on projects compared to eight supervisors, and their roles on projects are quite different than the roles of the supervisors. (App. 2). When applying the legal and factual considerations directed by the Court in this case, it is clear that individuals who are gate attendants are not similarly situated to Plaintiff or to other supervisors

under the economic realities test. As a result, notice to a putative class is not proper in this case.

Under the first factor under the economic realities test - the degree of control exercised by the alleged employer - the gate attendants clearly are not substantially similar to Plaintiff. Although the parties dispute whether Plaintiff was an independent contractor or an employee, it is not disputed that Plaintiff, like all supervisors, worked with Chambers under an agreement between she and Chambers for a particular project. (App. 2). The gate attendants, on the other hand, did not work under any agreement with Chambers. (App. 3). They were hired by, worked for, and were paid by, supervisors. (App. 3). Chambers exercises no control over the gate attendants. (App. 3). Their hours, rate of pay and specific duties are determined by their supervisor. (App. 3). Clearly, under this factor, they are not similarly situated with Plaintiff who, as noted, was a supervisor.

With regard to second factor - the extent of the relative investments of the workers and the alleged employer- this factor also demonstrates that the gate attendants and Plaintiff are not similarly situated. Although Chambers did have some obligations to supervisors, Chambers has virtually no obligations or investment regarding the gate attendants hired by the supervisors. Chambers has an agreement to pay supervisors a specific hourly amount for a project. (App. 2-3). Chambers also has an agreement to pay a per diem to the supervisors. (App. 3). Contrarily, Chambers does not have an agreement or obligation to gate attendants. (App. 3). Chambers does not pay the gate attendants – they are paid by their supervisors at the rate agreed upon between them. (App. 3). Chambers will, on occasion, if requested, give a supervisor a t shirt to give to a gate attendant if they want one. (App. 3). Also, on a few occasions, Chambers has had to pay a gate attendant when the gate attendant had not been paid by the supervisor. (App. 3-4). In sum, while Chambers does have some investment with supervisors such as Plaintiff, it has virtually no

6

investment with the gate attendants. Because the investment by Chambers in supervisors is significantly different than its investment in the gate attendants, the investment factor weighs against a finding of substantial similarity.

Likewise, consideration of the next factor in the economic realities test - the degree to which the workers opportunity for profit or loss is determined by the alleged employer - also weighs against a finding of substantial similarity between a supervisor like Plaintiff and the gate attendants to whom Plaintiff seeks to send notice. Although Chambers' position in this case is that Plaintiff and other supervisors are independent contractors who are responsible for determining their own profit/loss margins, for the purpose of determining substantial similarity between supervisors and gate attendants, it is clear the two groups are not substantially similar. To this end, while Chambers might arguably have a role in determining profit or loss with the supervisors by negotiating with them for the hourly rate to be paid on a project or for the per diem, Chambers has no role whatsoever in determining the opportunity for profit or loss for the gate attendants. Chambers does not hire, determine the rate of pay or determine the number of hours to be worked by the gate attendants. (App. 3). These things are done by the supervisors. (App. 3). Chambers is not involved in any of these decisions. (App. 3). This factor thus weighs against a finding of substantial similarity.

The next factor in the economic realities test - the skill and initiative required in performing the job – is significantly different for a supervisor like Plaintiff, and a gate attendant. The supervisor is responsible for dealing with the contact person for the customer, hiring gate attendants, determining their rate of pay, scheduling their hours, giving them instructions and paying them. (App. 2-3). Gate attendants do not have these duties. Their job is to watch the gate

and perform any other activities as directed by the supervisor. (App. 2-3). Thus, this factor weighs against a finding of substantial similarity.

The last factor under the economic realities test - the permanency of the relationship between the parties - also weighs against a finding of substantial similarity. Even though no parties are tied into a relationship with another party, as noted, Chambers has a per project agreement with supervisors such as Plaintiff. (App. 2-3). Contrarily, Chambers has no relationship with individual gate attendants. (App. 3). Under this structure, although a supervisor is not required to take a project offered by Chambers, once a supervisor has agreed to do the project, the supervisor does have a contractual obligation to service the project. (App. 2-3). The gate attendants have no such obligation to Chambers. (App. 3). There is no relationship between them and Chambers. (App. 3). The gate attendants are not substantially similar to that of the supervisors under this final factor in the economic realities test.

2.

CONCLUSION

Plaintiff has failed to satisfy the burden of establishing that Plaintiffs and the proposed opt-ins in this case are similarly situated. After reviewing the similarities and differences between the two groups in light of the economic realities test, it is apparent that the gate attendants are not substantially similar to a supervisor such as Plaintiff. The gate attendants are just too different than Plaintiff and other supervisors with respect to: (1) the degree of control exercised by Chambers with respect to each group; (2) the relative investment by Chambers in the different groups; (3) Chambers' role in determining profit or loss for each group; (4) the skill and initiative

in performing their respective duties on the project; and (5) the permanency of the relationships.

Therefore, notice should not be ordered and this case should not proceed on a collective basis.

                                            Respectfully Submitted,

                                            JOHNSTON & MILLER
                                            Attorneys at Law
                                            1212 13th Street, Suite 101
                                            Lubbock, Texas 79401
                                            Phone: (806) 785-1499
                                            Fax:   (806) 762-6901

                                 By:    <u>/s/ J. Craig Johnston</u>
                                                J. Craig Johnston
                                                State Bar No. 0078778

## CERTIFICATE OF SERVICE

      THIS WILL CERTIFY that a true and correct copy of this document has been served via the CM/ECF notification system on this the 13th day of May 2021

                                                <u>/s/ J. Craig Johnston</u>
                                                J. Craig Johnston