UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

MARISSA TORRES,

      Plaintiff,

v.

CHAMBERS PROTECTIVE SERVICES,
INC., et al.,

      Defendants.

No. 5:20-CV-212-H

### MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S OPPOSED MOTION TO AUTHORIZE NOTICE TO SIMILARLY SITUATED WORKERS

This case arises out of a wage dispute between Marissa Torres and her former employer, Chambers Protective Services, Inc., regarding whether Chambers violated the Fair Labor Standards Act by failing to pay overtime wages to her and other individuals for their work as hourly gate guards.  The parties dispute whether Chambers hired hourly gate guards as employees or independent contractors.  Torres has sued the founders of Chambers and three individuals involved in the day-to-day operations of Chambers on behalf of herself and other similarly situated workers.  Before the Court is Torres's Motion to Authorize Notice to Similarly Situated Workers requesting the Court to authorize her to send notice to other gate guards hired and directly paid by Chambers and to authorize electronic notice and opt-in.  Dkt. No. 22.

The Court grants the motion.  In FLSA collective-actions, courts can authorize a plaintiff to give notice to similarly situated individuals.  To decide whether a proposed class of individuals is similarly situated, courts consider three factors: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural

considerations.  Each of these factors weighs in favor of finding that the gate guards who

Torres requests to send notice to are similarly situated.  Additionally, Torres is an

appropriate representative plaintiff of the group of potential plaintiffs to whom she requests

to provide notice because she has shown that she is similarly situated to each of those

individuals.  Thus, the Court authorizes Torres to give notice to those individuals.  But

considering the applicable statute of limitations, the Court modifies the notice to limit the

group of gate guards notified to those individuals who worked for Chambers within three

years of the date of issuance of this order.  Additionally, because Torres has presented

unopposed evidence that allowing electronic notice and execution of opt-in forms would

facilitate notice, the Court also grants Torres's request to give notice by email and text

message and allow electronic execution of opt-in paperwork.

1.      **Factual and Procedural Background**

   A.      **Factual Allegations**[1]

   Chambers Protective Services, Inc. furnishes gate-attendant and security services to

parties that own large tracts of land for commercial uses—including wind farms and oil

leases.  Dkt. No. 24 at 3; Dkt. No. 27 at 3.  At these facilities, Chambers uses gate guards to

monitor who enters and exits and to drive around the property at regular intervals to check

for trespassers.  Dkt. No. 24 at 4; Dkt. No. 27 at 3.  These gate guards can be split into two

groups: supervisors and non-supervisors.[2]  *See id.*  Supervisors take on responsibilities in

addition to their work monitoring ingress and egress and checking for trespassers, though

---

[1] Unless otherwise noted, the facts in this section are undisputed.

[2] Chambers designates the individuals to whom Torres refers as supervisors in her briefing as project managers, job coordinators, and supervisors.  *See* Dkt. No. 24 at 42; Dkt. No. 28 at 4.  Thus, when used in this order, "supervisor" encompasses gate guards who were project managers, job coordinators, or supervisors.

2

the parties do not agree as to the extent of additional duties supervisors take on.  *See* Dkt. No. 24 at 4; Dkt. No. 28 at 6; Dkt. No. 31 at 2–3.  During the time period covered by the complaint, Chambers paid at least some supervisors and non-supervisors directly for their work.  Dkt. No. 24 at 3–5, 84–85; Dkt. No. 28 at 6–7.

Torres alleges that she and other gate guards were paid on an hourly basis and regularly worked over 40 hours per week.  Dkt. No. 1 at 2.  Torres additionally alleges that she and her coworkers never received any overtime pay from Chambers for hours that they worked in excess of 40 hours per week.  *Id.*  According to Torres, Chambers told her and other gate guards that they were independent contractors and paid them as independent contractors.  Dkt. No. 24 at 4, 14, 30.

Chambers does not deny that it did not pay overtime pay to gate guards for the hours that they worked beyond 40 hours in a given week.  *See* Dkt. No. 18 at 3–4.  Instead, Chambers asserts that it had no obligation to pay overtime wages because it did not employ gate guards but, instead, retained them as independent contractors.  *Id.* at 3–4.

### B.    Procedural Background

Torres filed her Original Collective Action Complaint alleging claims on her own behalf and on behalf of other similarly situated gate guards.  Dkt. No. 1.  After Chambers filed its Original Answer, Dkt. No. 18, the Court ordered the parties to file a joint status report regarding scheduling.  Dkt. No. 20.  Shortly after the Court ordered this status report, the Fifth Circuit published its opinion in *Swales v. KLLM Transport Services, L.L.C.*, which drastically altered the standard that courts must follow when determining whether a case can proceed on a collective basis.  985 F.3d 430, 439 (5th Cir. 2021).  The parties

subsequently filed their joint report, but they did not address how notice and discovery should proceed post *Swales*. *See* Dkt. No. 21.

After filing their joint report, the parties proceeded to conduct discovery—including interrogatories and exchanging documents—relevant to the issue of whether the putative collective-action members are similarly situated. *See* Dkt. No. 24 at 40–43, 45–100. Torres then filed her Motion to Authorize Notice to Similarly Situated Workers requesting the Court to approve her proposed notice to:

> All individuals who worked as gate guards or gate attendants for Chambers Protective Services, Inc. or its clients/customers, and who were paid by Chambers Protective Services, Inc. for their work on an hourly basis between May 1, 2018 and now.

Dkt. No. 22; Dkt. No. 23 at 10. Torres also requests the Court to authorize electronic notice—by email and text message—and electronic execution of opt-in paperwork. Dkt. No. 23 at 10. In support of her motion, Torres provides a 120-page appendix that includes a declaration of Torres and two of her coworkers, time sheets, Chambers's answers to Torres's interrogatories, records of payments that Chambers made to various gate guards, and Chambers's online job postings for gate guards. Dkt. No. 24.

After Torres filed this motion, the Court issued an order that clarified the factual and legal considerations relevant to the similarly situated inquiry, declined to authorize further preliminary discovery, and allowed the parties to file a motion requesting additional discovery relevant to the similarly situated issue. Dkt. No. 25. Neither party filed a timely request for additional discovery. However, Chambers filed a Motion for an Extension of Time to Seek Discovery Related to "Similarly Situated" Issue, Dkt. No. 34, over three months after Torres filed her motion to give notice and two and a half months after the deadline to seek additional discovery expired.

Chambers filed its brief in opposition.  Dkt. Nos. 26, 27.  Chambers argues that the gate guards to whom Torres wants to give notice are not similarly situated.  *Id.*  In support, Chambers argues that supervisor and non-supervisor gate guards—both of which are included in Torres's proposed group of collective-action members—are not similarly situated for the application of the economic-realities test, which is used to determine whether an individual was an employee or independent contractor.  *See id.*  The only evidence that Chambers provides to support its position is a three-page declaration of Amber Arriaga, Chambers's principal contact person with regard to projects involving gate attendants.  Dkt. No. 28.

Torres filed a reply.  Dkt. No. 30.  In that reply, she narrowed the potential group of individuals to be noticed to only those paid by Chambers:

> All individuals who worked as gate guards or gate attendants for Chambers Protective Services, Inc. or its clients/customers who were paid directly by Chambers Protective Services, Inc., Amber Arriaga, John Chambers, Christina Chambers, James Chambers, Michael Arriaga, or Allen Chambers at any time between June 1, 2018 and now.

Dkt. No. 30 at 7.  Along with her reply, Torres provided an additional 19-page appendix that included declarations of two more gate guards, their time sheets, and the records of Chambers's payments to one of those gate guards.  Dkt. No. 31.  Torres's Motion to Authorize Notice to Similarly Situated Workers is fully briefed and ripe for disposition.

**2.     Motions to Give Notice**

The FLSA authorizes an employee to sue her employer "for and [on] behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).  But "[n]o employee shall be a party plaintiff to any such action unless [s]he gives [her] consent in writing to become such a party and such consent is filed in the court in which such action

is brought." *Id.* Thus, "[a]n employee cannot benefit from a collective action without 'accurate and timely notice[]' . . . ." *Swales*, 985 F.3d at 435 (quoting *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).

"[D]istrict courts may oversee the notice and opt-in process. And since written consent is required by statute, a court's notice-sending authority is 'inevitable' in cases involving numerous potential plaintiffs." *Id.* Thus, district courts have discretion in overseeing collective actions and sending notice to potential opt-in plaintiffs, but that discretion is not unbridled. *Id.* at 436. A court's "'intervention in the notice process' cannot devolve into 'the solicitation of claims.'" *Id.* (quoting *Hoffmann-La Roche*, 493 U.S. at 174). Courts "must take care to avoid even the appearance of judicial endorsement of the merits of the action." *Id.* (quoting *Hoffmann-La Roche*, 493 U.S. at 174). Instead, "the district court's job is ensuring that notice goes out to those who are 'similarly situated,' in a way that scrupulously avoids endorsing the merits of the case." *Id.* at 440.

To determine "whether and to whom notice should be issued[,] . . . the district court needs to consider all of the available evidence." *Id.* at 442. Facts relevant to the determination of a merits issue—such as whether the plaintiffs are employees or independent contractors—may also be relevant to the determination of the similarly situated issue. *See id.* at 442–43. When determining whether plaintiffs are similarly situated, courts need not ignore such evidence to avoid using it for the wrong purpose—endorsing the merits of the case. *Id.*

When requesting notice to be sent to putative collective-action members, the plaintiff bears the burden of showing that the putative collective-action members are similarly situated. *Id.* at 443 n.65. To determine whether a plaintiff has met her burden of showing

that the putative collective-action members are similarly situated, courts consider three factors: (1) the disparate factual and employment settings of the proposed plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each proposed plaintiff; and (3) fairness and procedural considerations.[3]  *Segovia v. Fuelco Energy L.L.C.*, No. SA-17-CV-1246-JKP, 2021 WL 2187956, at *7 (W.D. Tex. May 28, 2021).

"From the statutory text, 'similarly situated,' as required for pursuit of an FLSA collective action, clearly differs from 'identically situated[]'"; thus, a plaintiff "need not establish identical situations to carry [her] burden to show 'similarly situated.'"  *Id.* at *8. Instead, courts must ask whether the plaintiff has "demonstrated similarity among the individual situations," which can be done by showing a factual nexus that binds the plaintiff and the putative collective-action members as alleged victims of a particular policy or practice.  *Id.*  Differences between a plaintiff and the putative collective-action members "will not preclude a collective action unless they are material to ultimate issues before the trial court."  *Id.*  Material distinctions "make a difference relevant to the legal issues presented."  *Id.*

After considering all available evidence, the district court may conclude that the plaintiff and the prospective opt-ins are similarly situated.  *Swales*, 985 F.3d at 442.  In such

---

[3] Prior to *Swales*, courts almost always used the two-tiered approach espoused in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987), to determine whether prospective opt-in plaintiffs in a proposed collective action were similarly situated enough to satisfy the FLSA.  *Swales*, 985 F.3d at 436.  These factors were used at step two of *Lusardi*—the decertification phase—to determine whether the named plaintiffs and opt-ins were similarly situated and could proceed to trial as a collective.  *Id.* at 437.  Even though *Swales* invalidated the *Lusardi* approach, Courts still use these factors to determine whether putative collective-action members are similarly situated at the outset of the case as required by *Swales*.  *See, e.g.*, *Segovia v. Fuelco Energy L.L.C.*, No. SA-17-CV-1246-JKP, 2021 WL 2187956, at *7 (W.D. Tex. May 28, 2021); *Hernandez v. Pritchard Indus. (Sw.), LLC*, No. SA-20-CV-00508-XR, 2021 WL 1146005, at *2 (W.D. Tex. Mar. 25, 2021); *Badon v. Berry's Reliable Res., LLC*, No. CV 19-12317, 2021 WL 933033, at *3 (E.D. La. Mar. 11, 2021).

a situation, the collective action will proceed.  *Segovia*, 2021 WL 2187956, at *8.  But if the district court finds that a plaintiff has not met her burden of establishing similarity or that the proposed collective is too diverse for the purpose of answering whether the putative class members are employees or independent contractors, it may: (1) decide that the case cannot proceed on a collective basis; (2) decide that it needs further discovery to make the similarly situated determination; or (3) find that certain subcategories of workers should receive notice.  *Swales*, 985 F.3d at 442.

3.    **Analysis**

    A.    **Chambers's requested additional discovery is irrelevant to the question of whether the potential plaintiffs are similarly situated or is unnecessary.**

Given the procedural stage of this case and Torres's narrowing of the group of potential plaintiffs in her reply, Chambers's Motion for an Extension of Time to Seek Discovery Related to "Similarly Situated" Issue seeks discovery that is not relevant to the issue of whether the Court should grant Torres's motion for notice or unnecessary.  At the outset of a collective action, a district court should identify "what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated.'"  *Swales*, 985 F.3d at 441.  After making such a determination, district courts "should authorize preliminary discovery accordingly."  *Id.*

Here, the Court identified the material legal issues to include: "(1) whether the putative class members are similarly situated with respect to the application of the economic-realities test; and (2) whether the plaintiff has met her burden of showing similarity of the putative class members."  Dkt. No. 25 at 2.  Additionally, the Court identified the material factual considerations as (1) the job descriptions and tasks of the putative class members; (2) the terms of employment of the putative class members; (3) the

hours that the putative class members worked; and (4) any other facts supporting similarity of the putative class members for the purpose of applying the economic-realities test. *Id.* at 2–3.

Chambers first argues that the Court should grant its request to conduct additional discovery because the evidence will show that supervisor gate guards—not Chambers— hired, managed, and paid non-supervisor gate guards. Dkt. No. 34 at 4. Chambers already made this argument and provided evidence to this effect in its response to Torres's motion to give notice. Dkt. No. 27 at 3–5. In her reply, Torres addressed this issue by narrowing the potential class of individuals to only gate attendants who were paid directly by Chambers. Dkt. No. 30 at 7. Because the Court has not identified factual considerations pertaining to gate guards who are not within the group of putative collective-action members as material, *see* Dkt. No. 25 at 2–3, this response moots any question as to whether gate guards not paid directly by Chambers are similarly situated.

Chambers also argues that the Court should grant its request to conduct additional discovery because the evidence will show that Torres's representations regarding Chambers's supply of uniforms, lodging costs, and payment to gate guards are incorrect. Dkt. No. 34 at 5. Even though these facts may be relevant to the application of the economic-realities test, at this stage, the only material legal question with respect to the test is whether the potential plaintiffs are similarly situated for the purposes of applying the test. Dkt. No. 24 at 2. Whether the test will ultimately indicate that the potential plaintiffs are independent contractors or employees is not a relevant legal question at this procedural stage. *See Swales*, 985 F.3d at 442 ("Considering, early in the case, whether merits questions can be answered collectively has nothing to do with endorsing the merits."). Additionally,

Chambers does not allege that additional discovery will reveal that different gate guards directly paid by Chambers were treated differently with respect to uniforms, lodging costs, and payment.  Thus, the Court finds that Chambers's requested pre-notice discovery seeking facts disproving Torres's factual representations regarding Chambers's supply of uniforms, lodging costs, and payment to gate guards is irrelevant to the determination of whether to authorize notice.

Finally, Chambers argues that the Court should grant its request for additional discovery because the evidence will show that Torres was a supervisor.  Dkt. No. 34 at 5.  But the fact that Torres was a supervisor is undisputed.  Dkt. No. 30 at 1.  And Chambers does not allege that additional evidence will reveal that, contrary to Torres's assertions, Torres did not work as a non-supervisor gate guard before becoming a supervisor.  *See* Dkt. No. 34 at 5–6.  Finally, Chambers overlooks the fact that Torres's proposed group of collective-action members includes all gate guards—supervisors and non-supervisors.  Dkt. No. 30 at 7.  Thus, additional discovery as to whether Torres was a supervisor is unnecessary.  Accordingly, all of the discovery sought by Chambers in its  Motion for an Extension of Time to Seek Discovery Related to "Similarly Situated" Issue is either irrelevant to the similarly situated question or is unnecessary.

**B.**     **The Court grants Torres's request to issue notice to all gate guards hired and directly paid by Chambers.**

The Court finds that each factor relevant to the issue of whether a group of putative collective-action members are similarly situated weighs in favor of a similarly situated finding for the group of gate guards hired and directly paid by Chambers.  The first factor weighs in favor of a similarly situated finding because all of the putative class members had similar duties, hours, and pay.  The second factor also weighs in favor of a similarly situated

finding because the Court can divide the proposed group of putative collective-action members into two subgroups and apply Chambers's defense—that the putative class members were independent contractors, not employees—collectively to each subgroup. Finally, the third factor weighs in favor of a similarly situated finding because allowing a collective action here would ensure efficient resolution of the putative collective-action members' claims.

Because each of the three similarly situated factors supports a finding that Torres's proposed class is similarly situated, the Court concludes that this case can proceed as a collective action.  Additionally, Torres is an appropriate representative plaintiff because she has provided evidence that she worked both as a supervisor and non-supervisor gate guard during the relevant time period and is similarly situated to the potential plaintiffs in both of these subgroups of potential gate-guard plaintiffs.  *See* Dkt. No. 24 at 4.  Thus, the Court grants Torres's request to issue notice to gate guards hired and directly paid by Chambers.

### 1.    The potential plaintiffs share similar factual and employment settings.

Given the similarities between the putative class members' jobs and pay, the first factor—disparate factual and employment settings of the individual plaintiffs—indicates that those individuals are similarly situated.  This factor "assesses the [potential] opt-in plaintiffs' job duties, geographic location, supervision, and salary to determine if the [potential opt-ins] are similarly situated."  *Snively v. Peak Pressure Control, LLC*, 314 F. Supp. 3d 734, 739 (W.D. Tex. 2018).  "The presence of a common policy, plan, or practice affecting all putative class members, although not required, can be helpful in assessing the first factor."  *Vanzzini v. Action Meat Distributors, Inc.*, 995 F. Supp. 2d 703, 721 (S.D. Tex. 2014).  Where there are legitimate differences between putative collective-action members, the first factor does not

weigh against a similarly situated finding unless FLSA liability turns on the identified differences. *See Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp. 3d 674, 688 (W.D. Tex. 2014), *aff'd*, 656 F. App'x 688 (5th Cir. 2016) ("These are legitimate differences, but [the employer] does not explain why they are material and preclude collective resolution of this case. FLSA liability does not turn on the geographic location of a workplace or on the identity of a direct supervisor."). Thus, where a plaintiff's claims are based on an employer's allegedly unlawful policy, noted differences between putative collective-action members that do not relate to the policy will not provide a basis for a court to find that the first factor weighs against a similarly situated finding. *See Allen v. City of Chicago*, No. 10 C 3183, 2014 WL 5461856, at *6–7 (N.D. Ill. Oct. 22, 2014).

Torres has shown that the gate guards to whom she wants to send notice have similar job duties and are all subject to the same pay policy—lack of overtime pay for hours worked beyond 40 hours per week. These gate guards, regardless of whether they were supervisors, had similar job duties—serving as a gate guard and checking for trespassers at gated facilities. Dkt. No. 24 at 4, 14, 30; Dkt. No. 28 at 6; Dkt. No. 31 at 2–3, 15. And Chambers allegedly paid all of its gate guards hourly for their work, required them to work over 40 hours per week, and did not disperse overtime pay. Dkt. No. 24 at 3, 13, 29, 31; Dkt. No. 31 at 2, 15. Chambers provides no evidence that it applied different pay or overtime-pay policies to any subsection of the potential opt-in plaintiffs—individuals who worked as gate guards for Chambers and were paid directly by Chambers.

There are differences between some of the putative collective-action members, but the defendants have failed to provide any evidence that those differences are material to the FLSA claim at issue. First, the gate guards worked on sites across the nation and, therefore,

worked in different geographical locations.  Dkt. No. 24 at 14; Dkt. No. 28 at 85.

Additionally, some gate guards were supervisors who had additional duties and some

authority over non-supervisor gate guards.[4]  Dkt. No. 24 at 4, 14; Dkt. No. 28 at 5–6; Dkt.

No. 31 at 3.  Finally, the gate guards were paid different hourly wages.  Dkt. No. 24 at 3, 13,

29, 31; Dkt. No. 31 at 2, 15.  But these differences are separate from the alleged unlawful

practice—failure to pay overtime wages to individuals misclassified as independent

contractors.  And Chambers does not provide any evidence or argue that these differences

are material as to the issue of whether it had a practice of not paying overtime wages to gate

guards who it paid directly.[5]  *See* Dkt. Nos. 27, 28.

In a similar situation, one court found that the first factor weighed in favor of a

similarly situated finding.  *See Allen*, 2014 WL 5461856, at *6–7 (applying factors at

decertification phase).  In *Allen*, the group of opt-in plaintiffs included individuals who had

different supervisors and teams of subordinates, different job duties, and worked in different

locations.  *Id.* at *6.  The court found that these differences did not diminish the evidence of

a common unlawful policy applied by the employer.  *Id.* at *7.  Accordingly, *Allen*

concluded that the jobs were sufficiently similar to support a collective action "insofar as

---

[4] The parties do not agree as to the scope of additional duties and supervisory authority that supervisors took on, but both Torres's and Chambers's evidence indicates that supervisors had some duties and supervisory authority that general gate guards did not have.

[5] Chambers does provide evidence that subgroups of the non-supervisor gate guards not directly paid by Chambers were subject to differing employment provisions.  *See* Dkt. No. 28 at 6 ("[Supervisors would] determin[e] . . . the amount the supervisor would pay individual gate attendants.").  This evidence indicates that the non-supervisor gate guards not directly paid by Chambers may have had disparate factual and employment settings and, therefore, that the first factor weighs against finding that those individuals are similarly situated.  But Torres limited her proposed notice to gate guards "who were paid directly by Chambers."  Thus, the evidence pertaining to the non-supervisor gate guards not directly paid by Chambers is irrelevant to the question of whether the Court can collectively analyze Torres's overtime claim with respect to gate guards paid directly by Chambers.

they pertain[ed] to the alleged unwritten policy, which the plaintiffs allege[d] did not vary based on the job duties." *Id.*

Like the group of opt-in plaintiffs in *Allen*, the putative collective-action members here have different supervisors, work on different teams, have some varying job duties, and work in different locations.  But as in *Allen*, none of these differences diminish Torres's evidence that Chambers did not disperse overtime pay to any individuals who it directly paid for performing gate-guard duties.  Thus, like *Allen* the Court concludes that the gate guards who were paid directly by Chambers had sufficiently similar factual and employment settings with respect to the issue of whether Chambers failed to disperse overtime pay to support a collective action on that basis.  Accordingly, the Court finds that the first similarly situated factor—disparate factual and employment settings of individual plaintiffs—weighs in favor of finding that the putative collective-action members are similarly situated.

### 2.    The relevant defense can be applied to the collective action and will not require individualized inquiry.

The second factor—defenses available to the defendant which appear to be individual to each plaintiff—indicates that the plaintiff's proposed class is similarly situated because even though the economic-realities test must be applied separately to supervisors and non-supervisors, it can be applied collectively within those respective subgroups.  This factor weighs against a similarly situated finding where defenses are individualized and, therefore, prevent an efficient proceeding with a representative class.  *Reyes v. Texas Ezpawn, L.P.*, No. CIV.A. V-03-128, 2007 WL 101808, at *5 (S.D. Tex. Jan. 8, 2007).  Thus, whether an employee argues that one defense applies to all plaintiffs is beside the point; "the fact that an individualized inquiry will likely be necessary weighs strongly in favor of

14

decertification." *Clay v. New Tech Glob. Ventures, LLC*, No.  CV 16-296-JWD-CBW, 2019 WL 1028532, at *14 (W.D. La. Mar. 4, 2019).

Here, Chambers asserts as a defense that all putative collective-action members were independent contractors but also argues that the application of that defense requires separate analysis with respect to supervisor and non-supervisor gate guards.  "To determine if a worker qualifies as an employee, [courts] focus on whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008).  To conduct this analysis, courts consider five non-exhaustive factors:

(1)     the degree of control exercised by the alleged employer;

(2)     the extent of the relative investments of the worker and the alleged employer;

(3)     the degree to which the worker's opportunity for profit or loss is determined by the alleged employer;

(4)     the skill and initiative required in performing the job; and

(5)     the permanency of the relationship.

*Id.*  "No single factor is determinative"; instead, "each factor is a tool used to gauge the *economic dependence* of the alleged employee, and each must be applied with this ultimate concept in mind."  *Id.* (emphasis in original).

In this case, the putative collective-action members include two subgroups of gate guards—supervisors and non-supervisors.  Because supervisors accept additional responsibilities that non-supervisor gate guards do not, the Court finds that the economic-realities test cannot be applied collectively to a single group of gate guards that includes both supervisors and non-supervisors.  But Torres presents evidence that indicates the Court can

apply the economic-realities test to supervisors and non-supervisors collectively as separate groups. And Chambers provides no evidence that the economic-realities test must be applied individually to gate guards within either subgroup. Thus, the Court finds that it can resolve Chambers's defense that the gate guards were independent contractors by applying the economic-realities test twice—first, to supervisor gate guards and, second, to non-supervisor gate guards. Accordingly, the Court finds that the individual-defenses factor weighs in favor of collective action because Chambers's defense is not sufficiently individualized to prevent an efficient collective action.

   **i.**   **The Court cannot apply the economic-realities test collectively to a combined group of supervisor and non-supervisor gate guards.**

The first and fourth factor of the economic-realities test applies differently to the non-supervisor gate guards than to the supervisors. With respect to the first factor—the degree of control exercised by the alleged employer—Chambers provides evidence that it had a more-involved relationship with its supervisor gate attendants than it did with the non-supervisor gate attendants. Dkt. No. 28 at 6. Similarly, Torres's evidence indicates that even though supervisor and non-supervisor gate guards reported to Arriaga, who runs Chambers's day-to-day operations, supervisors had the additional task of ensuring that non-supervisor gate guards reported to work and reporting those individuals' time to Chambers. Dkt. No. 31 at 3. Thus, the first economic-realities factor cannot be applied similarly as to supervisors and non-supervisors.

With respect to the fourth factor—the skill and initiative required in performing the job—Chambers provides evidence that supervisors managed projects, dealt with customers, and hired gate guards and, therefore, needed additional skill and initiative to perform their

jobs than non-supervisors.  Dkt. No. 28 at 6.  Similarly, Torres's evidence indicates that supervisors needed a different level of skill and expertise than non-supervisors to do their job because supervisors had additional required tasks, including (1) ensuring other gate guards were at their post, Dkt. No. 31 at 3; (2) reporting those individuals' time to Chambers, *id.*; and (3) hiring gate guards, Dkt. No. 24 at 4, 14.  Thus, the fourth economic-realities factor cannot be applied similarly as to supervisors and non-supervisors.

Because the first and fourth economic-realities factors apply differently as to supervisors and non-supervisors, the Court must separately analyze whether the supervisor and non-supervisor putative collective-action members are employees.

### ii. The Court can apply the economic-realities test collectively within the supervisor and non-supervisor subgroups.

Torres has provided evidence showing that the economic-realities test can be applied collectively within the respective supervisor and non-supervisor subgroups, and Chambers provides no evidence to the contrary.  First, Torres's evidence indicates that the economic-realities test can be collectively applied as to the non-supervisor subgroup.  Torres provides evidence that Chambers exercised a similar degree of control over all non-supervisor gate guards because those individuals all reported to Arriaga, who runs Chambers's day-to-day operations.  Dkt. No. 24 at 4, 30; Dkt. No. 31 at 3.  Torres also provides evidence that Chambers invested in gate guards similarly by paying them an hourly wage, giving them shirts, and covering their lodging costs.  Dkt. No. 24 at 4, 14–15; Dkt. No. 31 at 16. Additionally, Torres's evidence indicates that for all gate guards, the opportunity for profit or loss was determined by the amount of hours they worked.  Dkt. No. 24 at 4, 14; Dkt. No. 31 at 16.  Moreover, Torres provides evidence indicating that all gate guards needed similar skill and initiative to perform their jobs because their jobs required them to check fences for

trespassers, check locks, and monitor entry into the premises.  Dkt. No. 24 at 4, 14; Dkt. No. 31 at 15.  Finally, as to the permanency of the relationship, Torres provides evidence that all gate guards were hourly employees.  Dkt. No. 24 at 3, 13; Dkt. No. 31 at 15.  Because this evidence shows that each factor of the economic-realities test applies similarly to the non-supervisor gate guards, it indicates that the test can be collectively applied as to those individuals.

Additionally, Torres's evidence indicates that the Court can apply the economic-realities test collectively as to all supervisor gate guards.  As to the first factor, Torres's evidence indicates that all supervisor gate guards, like the non-supervisor gate guards, reported to Arriaga.  Dkt. No. 24 at 14, Dkt. No. 28 at 6; Dkt. No. 31 at 3.  The evidence also indicates that all supervisors had additional duties of hiring non-supervisor gate guards for work, monitoring work attendance, and reporting those individuals' time to Chambers. Dkt. No. 24 at 4, 14, Dkt. No. 28 at 14; Dkt. No. 31 at 3.  Because this evidence indicates that supervisors worked for Arriaga and had similar authority, it also indicates that Chambers exercised a similar level of control over all of its supervisor gate guards.

With respect to the second factor, Torres's evidence shows that Chambers also paid supervisors an hourly wage, gave them shirts, and covered lodging costs.  Dkt. No. 24 at 4, 14–15; Dkt. No. 31 at 3, 16.  Regarding the third factor, Torres provides evidence that supervisors' opportunity for profit or loss was determined by the amount of hours that they worked.  Dkt. No. 24 at 4, 14–15; Dkt. No. 31 at 3.  Relevant to the fourth factor, Torres presents evidence showing that supervisors needed similar skills and initiative to accomplish their job tasks, which included checking fences for trespassers, checking locks, monitoring entry into the premises, ensuring other gate guards were at their post, reporting non-

supervisor gate guards' time to Chambers, and hiring gate guards.  Dkt. No. 24 at 4, 14;
Dkt. No. 31 at 3.  Finally, as to the fifth factor, Torres's evidence shows that all supervisors
were hourly employees.  Dkt. No. 24 at 3, 13; Dkt. No. 31 at 2.  Because Torres's evidence
shows that each factor of the economic-realities test applies similarly to the supervisor gate
guards, it indicates that the test can also be collectively applied as that subset of gate guards.

In its response and motion for discovery, Chambers does not argue or point to any
evidence indicating that the economic-realities test cannot be applied collectively as to
supervisors or non-supervisors as subgroups of gate guards that it paid.[6]  Dkt. No. 27.
Rather, the evidence that Chambers provides supports a finding that the Court can apply the
economic-realities test collectively as to the two subgroups.  *See* Dkt. No. 28.  A court may
find that the economic-realities test can be applied universally where a plaintiff has provided
evidence to that effect and the defendant has failed to provide any contrary evidence.  *Badon
v. Berry's Reliable Res., LLC*, No. CV 19-12317, 2021 WL 933033, at *3 (E.D. La. Mar. 11,
2021).  Thus, considering Chambers's failure to provide evidence that the Court cannot
apply the economic-realities test collectively within the supervisor and non-supervisor
subgroups, the Court finds that it can apply the test collectively within these subgroups.

***

Because the Court can split the putative class members into supervisor and non-
supervisor subgroups and apply the economic-realities test to those subgroups, it finds that
Chambers's defense that the gate guards were independent contractors does not need to be
applied individually.  Thus, the Court finds that the second similarly situated factor—

---

[6] Chambers argues only that supervisors and non-supervisors cannot be analyzed together for the
purposes of applying the economic-realities test.  *See* Dkt. No. 27.

defenses available to the defendant which appear to be individual to each plaintiff—weighs in favor of finding that the plaintiff's proposed class is similarly situated.

### 3. Fairness and procedural concerns weigh in favor of collective treatment

The third similarly situated factor—fairness and procedural concerns—weighs in favor of a finding that the plaintiff's proposed class is similarly situated because collective treatment would allow for efficient resolution of the putative class members' claims.  When evaluating this factor, "courts consider 'the primary objectives' of FLSA collective actions – '(1) to lower costs to the plaintiffs through the pooling of resources, and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arise from the same alleged activity.'"  *Segovia*, 2021 WL 2187956, at *11 (quoting *Snively*, 314 F. Supp. 3d at 743.  Courts also consider "whether the court 'can coherently manage the class in a manner that will not prejudice any party.'"  *Id.*

In this case, allowing the putative collective-action members to sue collectively would lower their costs to pursue any claims that they have against Chambers and allow the Court to efficiently resolve common issues of law and fact that pertain to the proposed collective of gate guards in one proceeding instead of multiple individual proceedings.  This is true even though the economic-realities test cannot be applied collectively as to the full group of gate guards because the Court still can coherently manage Torres's proposed class in a manner that will not prejudice any party by splitting the gate guards into supervisor and non-supervisor subgroups and applying the test to each subgroup separately.  Additionally, declining to address the application of the economic-realities test as to supervisors and non-supervisors in one action would be inefficient.  Such action would require Torres or another gate guard to file a second and separate collective action and motion to authorize notice

and, therefore, would unnecessarily delay notice to at least one subgroup and increase costs for the putative collective-action members.  Thus, allowing the putative collective-action members to proceed collectively will lower costs and ensure efficient resolution of legal and factual issues relevant to those members' claims.

Finally, even though Chambers does provide evidence and argument that the economic-realities test cannot be applied collectively to all gate guards, it provides no evidence that if the Court applies that test to either supervisors or non-supervisors collectively, the proposed collective action would devolve into a cacophony of individual actions.  Thus, the Court finds that the third similarly situated factor—fairness and procedural concerns—weighs in favor of finding that the plaintiff's proposed putative collective-action members are similarly situated.

### 4.    Torres is an appropriate lead plaintiff.

Torres has shown that she is similarly situated to the putative collective-action members and, therefore, that she is an appropriate lead plaintiff.  "In order to bring a representative action, . . . the plaintiffs must be 'similarly situated' to one another."  *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2008).  Thus, to be an appropriate lead plaintiff, an employee must show that she is similarly situated to all of the putative collective-action members.  *See Burke v. Mgmt. & Training Corp.*, No. 316CV00152NBBJMV, 2018 WL 4038115, at *2 (N.D. Miss. Aug. 23, 2018) ("The lead plaintiff in a collective action "bears the burden of showing that [he] and the opt-in plaintiffs are similarly situated.") (quoting *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012)).

Torres has shown that she is similarly situated to all of the putative collective-action members. First, like the putative collective-action members, the evidence before the Court indicates that Torres was paid directly by Chambers for performing her gate-guard duties. Dkt. No. 24 at 84–85. Additionally, Torres worked over 40 hours per week and did not receive overtime pay. *Id.* at 3–4. Finally, Torres served as both a non-supervisor and supervisor gate guard and is similarly situated to each of those subgroups for the application of the economic-realities test. Like the non-supervisor gate guards, (1) Torres reported to Arriaga; (2) Chambers paid her an hourly wage, gave her shirts, and covered her lodging costs; (3) she received more money if she worked more; (4) she performed duties of monitoring for trespassers, checking locks, and controlling entry; and (5) she was an hourly employee. *Id.* at 3–4. And like the supervisor gate guards, (1) Torres reported to Arriaga; (2) Chambers paid her an hourly wage, gave her shirts, and covered her lodging costs; (3) she received more money if she worked more; (4) she performed duties of monitoring for trespassers, checking locks, controlling entry, ensuring other gate guards were at their post, reporting other gate guards' time to Chambers, and hiring gate guards; (5) and she was an hourly employee. *Id.*

Chambers argues that Torres is not an appropriate lead plaintiff because she and the potential collective-action members are independent contractors. However, *Swales* precludes this argument. "Considering, early in the case, whether merits questions can be answered collectively has nothing to do with endorsing the merits." *Swales*, 985 F.3d at 442. At the notice stage of a collective action where the threshold issue—whether a worker was misclassified as an independent contractor—depends on the economic-realities test, the district court needs "to consider the evidence . . . to determine whether the economic-

realities test could be applied on a collective basis." *Id.* at 442.  Nothing in *Swales* indicates or encourages courts to circumvent the notice analysis and move directly to the merits.  In fact, *Swales* discourages courts from weighing in on the merits at this point.  *Id.* at 436 ("[When overseeing the notice process,] district courts must take care to avoid even the appearance of judicial endorsement of the merits of the action.  No judicial thumbs (or anvils) on the scale.").

In this case, Chambers admits that Torres worked over 40 hours per week and did not receive overtime pay.  Dkt. No. 18 ¶ 25.  Additionally, Chambers asserts that it is not legally required to pay overtime to gate guards for hours that they worked in excess of 40 hours per week.  *Id.* ¶ 24, 28.  Thus, the primary merits question is whether the potential gate-guard plaintiffs were misclassified as independent contractors—a question that turns on the application of the economic-realities test.  Accordingly, if the Court decided, as Chambers requests, that Torres is an inappropriate lead plaintiff on the basis that she and the potential plaintiffs are independent contractors, it would weigh in on a merits question at the notice stage in violation of *Swales.*  Instead, at this stage, the Court may only determine whether Torres and the potential plaintiffs are similarly situated for the application of the economic-realities test.

Additionally, Chambers argues that Torres is not an appropriate lead plaintiff because she was a supervisor, and the putative collective-action members include non-supervisor gate guards.  But this argument ignores the fact that Torres worked both as a supervisor and non-supervisor gate guard.  Dkt. No. 24 at 5.  And as the Court has already determined, Torres is similarly situated to both subcategories of potential plaintiffs.  Thus,

the Court finds that Torres is an appropriate lead plaintiff for each putative collective-action member.[7]

***

Because each of the three similarly situated factors weighs in favor of finding that Torres's proposed class is similarly situated—and Torres is an appropriate representative for each putative collective-action member—the Court concludes that this case can proceed as a collective action.  Accordingly, the Court grants Torres's request to issue notice to:

> All individuals who worked as gate guards or gate attendants for Chambers Protective Services, Inc. or its clients/customers and who were paid directly [for providing gate-guard or gate-attendant services][8] by Chambers Protective Services, Inc., [or on behalf of Chambers Protective Services, Inc. by][9] Amber Arriaga, John Chambers, Christiana Chambers, James Chambers, Michael Arriaga, or Allen Chambers[,] at any time between [three years prior to the date of issuance of this order] and now.[10]

---

[7] Even if the Court had determined that Torres was not an appropriate lead plaintiff, Fifth Circuit precedent would allow this case to proceed as a collective action.  Where a court finds that a case may proceed as a collective action but that the named lead plaintiff is not an appropriate representative of the potential plaintiffs, the Court may allow counsel to offer another suitable plaintiff to lead the collective action and must allow the original lead plaintiff to proceed individually.  *See Portillo v. Permanent Workers, L.L.C.*, 662 Fed. Appx. 277, 281 (5th Cir. 2016) (holding that where a court has allowed a collective action to proceed with a different lead plaintiff, it should allow counsel to offer another suitable lead plaintiff and that, in such a situation, a court errs if it dismisses the original lead plaintiff's claims and does not allow that party to proceed individually).

[8] The Court adds this language to clarify that the class of individuals to whom notice may be sent includes only individuals who worked as gate guards or gate attendants for Chambers and were paid directly by Chambers for those services.

[9] The Court adds this language to clarify that the class of individuals to whom notice may be sent does not include any gate guards or gate attendants who received payment that was not made on behalf of Chambers.

[10] The statute of limitations for FLSA claims is generally two years but is expanded to three years for willful violations.  29 U.S.C. § 255(a) (An FLSA claim "shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.").  Here, Torres alleges that Chambers willfully violated the FLSA, Dkt. No. 1 at 6–7, so the statute of limitations for Torres and the gate guards who she requests to issue notice to is three years.  But "[n]o employee shall be a party plaintiff to any [FLSA collective] action unless he gives his consent

**C.    The Court grants Torres's request to issue notice to putative collective-action members electronically.**

Because Torres has provided evidence that electronic notice would be the most effective method of notifying the putative collective-action members, issuance of notice by electronic mail and text message and electronic execution of opt-in forms is appropriate. Generally, courts grant requests to give electronic notice if that action is likely to facilitate notice, and courts typically deny the requests when a defendant makes a showing that such action is not likely to facilitate notice. *Jones v. Cretic Energy Servs., LLC*, 149 F. Supp. 3d 761, 776 (S.D. Tex. 2015) (citing cases). And multiple courts have allowed text-message notice. *Young v. Energy Drilling Co.*, No. 4:20-CV-1716, 2021 WL 1550343, at *4 (S.D. Tex. Apr. 20, 2021). Additionally, courts that have allowed electronic notice also allowed putative collective-action members to execute their opt-in forms online through an electronic-signature service. *See, e.g.*, *Marcil v. Silverleaf Resorts, Inc.*, No. 3:12-CV-4247-N, 2013 WL 12363619, at *4 (N.D. Tex. Apr. 8, 2013); *Jones v. JGC Dall. LLC*, No. 3:11-CV-2743-O, 2012 WL 6928101, at *8 (N.D. Tex. Nov. 29, 2012), *report and recommendation adopted*, No. 3:11-CV-2743-O, 2013 WL 271665 (N.D. Tex. Jan. 23, 2013).

Torres has provided evidence that because the putative collective-action members travel for their work, notice by electronic mail and text would be important to ensure that those individuals receive notice. Dkt. No. 24 at 5, 15, 31; Dkt. No. 31 at 16. Chambers does not object to any of this evidence nor do they argue that the proposed notice and opt-in

---

in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b). Thus, "the FLSA's statute of limitations continues to run on each individual's claim until they file their written consent to join the collective action with the court." *Wesley v. Experian Info. Sols., Inc.*, No. 4:18-CV-00005, 2018 WL 3105763, at *3 (E.D. Tex. June 25, 2018). Accordingly, the Court modifies the date on Torres's proposed notice to the date three years before the issuance of its order to limit the group of gate guards noticed to those whose statute of limitations has not passed.

procedures are improper. *See* Dkt. No. 27. Thus, the Court grants Torres's requests to allow her to issue notice to putative collective-action members by electronic mail and text message, in addition to by regular mail, and to allow opt-in forms to be completed online through an electronic-signature service.

**6.     Conclusion**

All three factors considered when deciding whether a group of putative collective-action members are similarly situated weigh in favor of finding that the gate guards directly paid by Chambers—the individuals to whom Torres wants to give notice—are similarly situated. Thus, the Court finds that those individuals are similarly situated. Additionally, Torres is an appropriate representative plaintiff of the group of potential plaintiffs to whom she requests to provide notice. Therefore, the Court authorizes Torres to issue notice to them. But, in accordance with the applicable statute of limitations, the Court limits the group of gate guards notified to the individuals who worked as gate guards within three years of the date that the Court issues its order.

Therefore, the Court authorizes Torres to issue notice to:

All individuals who worked as gate guards or gate attendants for Chambers Protective Services, Inc. or its clients/customers and who were paid directly for providing gate-guard or gate-attendant services by Chambers Protective Services, Inc., or on behalf of Chambers Protective Services, Inc. by Amber Arriaga, John Chambers, Christiana Chambers, James Chambers, Michael Arriaga, or Allen Chambers, at any time between three years prior to the date of issuance of this order and now.

Additionally, because Torres has presented unopposed evidence that allowing electronic notice and execution of opt-in forms would facilitate notice, the Court also grants Torres's request to give notice by email and text message and to allow electronic execution of opt-in paperwork.

No later than 30 days from the issuance of this order, defendants must provide Torres with the names and contact information of all individuals to whom the Court has authorized Torres to provide notice.  Torres must send notice no later than 42 days after the issuance of this order.  Finally, noticed individuals who intend to join this collective action must execute the appropriate opt-in paperwork no later than 72 days after the issuance of this order.

So ordered on August 5, 2021.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE